UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**2025 FEB 27 PM 2: 02**

CLERK
BY_____ *lAvv*
DEPUTY CLERK

CHRISTOPHER K.,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )        Case No. 2:24-cv-00667
                                   )
MICHELLE KING,                     )
Commissioner of Social Security,   )
                                   )
          Defendant.               )

## OPINION AND ORDER GRANTING PLAINTIFF'S MOTION FOR AN ORDER REVERSING THE DECISION OF THE COMMISSIONER AND DENYING THE COMMISSIONER'S MOTION TO AFFIRM
(Docs. 9 & 10)

Plaintiff Christopher K., a claimant for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") payments under the Social Security Act ("SSA"), brings this action pursuant to 42 U.S.C. § 405(g) to reverse the decision of the Social Security Commissioner (the "Commissioner") that he is not disabled.[1] (Doc. 9.) The Commissioner moves to affirm. (Doc. 10.) The court took the pending motions under advisement on October 30, 2024.

After Plaintiff's applications for DIB and SSI were denied initially and on reconsideration by the Social Security Administration, Administrative Law Judge ("ALJ") Patricia W. Supergan found Plaintiff ineligible for benefits because he had not been under a disability within the meaning of the SSA from May 2, 2018, through the

---

[1] Disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months[.]" 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A claimant's "physical or mental impairment or impairments" must be "of such severity" that the claimant is not only unable to do any previous work but cannot, considering the claimant's age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

date of her decision. Plaintiff administratively appealed the decision, and the Appeals Council denied review, at which point the ALJ's decision became final.

On appeal, Plaintiff argues that ALJ Supergan erred by failing to address the supportability and consistency of the opinions of state agency consultants Ranga Reddy, M.D.; Bharati Jhaveri, M.D.; David Voss, Ph.D.; Margaret DiFonso, Psy.D.; and Frank Froman, Ed.D. He further argues that his residual functional capacity ("RFC") is not supported by substantial evidence. Plaintiff seeks a remand for a new hearing.

Plaintiff is represented by Arthur P. Anderson, Esq. Special Assistant United States Attorney Jason P. Peck represents the Commissioner.

## I.    Procedural History.

Plaintiff filed his applications for DIB and SSI on April 26, 2021, alleging disability beginning May 2, 2018, based on his pancreatitis as well as pain in his neck, heels, and ankles. After his claim and request for reconsideration were denied, Plaintiff timely filed a request for a hearing, which was held by telephone before ALJ Supergan on April 14, 2023. Plaintiff appeared and was represented by attorney Vicki Aukerman. Both Plaintiff and Vocational Expert ("VE") Don Wang testified.

On August 30, 2023, ALJ Supergan issued an unfavorable decision, which Plaintiff administratively appealed. The Appeals Council denied review on April 29, 2024. As a result, the ALJ's disability determination stands as the Commissioner's final decision.

## II.    ALJ Supergan's August 30, 2023 Decision.

At the onset date of his alleged disability, Plaintiff was forty-seven years old, "which is defined as a younger individual age [eighteen to forty-nine]," and "subsequently changed age category to closely approaching advanced age" during the pendency of his claim. (Doc. 8-1 at 33.) The ALJ found that Plaintiff has at least a high school education and his past employment includes work as a maintenance worker.

In order to receive DIB or SSI under the SSA, a claimant must be disabled on or before the claimant's date last insured. A five-step, sequential-evaluation framework determines whether a claimant is disabled:

> (1) whether the claimant is currently engaged in substantial gainful activity;
> (2) whether the claimant has a severe impairment or combination of
> impairments; (3) whether the impairment meets or equals the severity of the
> specified impairments in the Listing of Impairments; (4) based on a
> "residual functional capacity" assessment, whether the claimant can
> perform any of his or her past relevant work despite the impairment; and
> (5) whether there are significant numbers of jobs in the national economy
> that the claimant can perform given the claimant's residual functional
> capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing 20 C.F.R.
§§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v)).

"The claimant has the general burden of proving that he or she has a disability
within the meaning of the Act, and bears the burden of proving his or her case at steps
one through four of the sequential five-step framework established in the SSA
regulations[.]" *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal quotation
marks and citation omitted). At Step Five, "the burden shift[s] to the Commissioner to
show there is other work that [the claimant] can perform." *McIntyre*, 758 F.3d at 150
(alterations in original) (internal quotation marks omitted).

At Step One, ALJ Supergan found Plaintiff met the SSA's insured status
requirements through June 30, 2022, and that he had not engaged in substantial gainful
activity since May 2, 2018, the alleged onset date. At Step Two, she concluded that
Plaintiff had the following severe impairments: degenerative disc disease of the cervical
spine, degenerative joint disease of the bilateral ankles, alcoholic pancreatitis, alcohol
abuse disorder, and depression.

At Step Three, the ALJ determined that Plaintiff did not have an impairment or
combination of impairments that met or medically equaled the severity of one of the
Listings. Specifically, ALJ Supergan found that "[t]he record does not document the
specific neurological signs required by part B of [L]istings 1.15 or 1.16, and there is
insufficient evidence of a medical need for a walker, bilateral canes, bilateral crutches, or
a wheelchair (or the combination of impairment of a single upper extremity and the
medical need for a single-arm assistive device), as required by part D of those [L]istings."

(Doc. 8-1 at 25.) The ALJ further found that "the record does not document the type and degree of anatomical abnormality, or abnormal motion, instability, or immobility of joints" required by parts B and C of Listing 1.18. *Id.*

ALJ Supergan concluded that Plaintiff's mental impairment did not meet or medically equal the paragraph B criteria Listing 12.04, which requires the impairment to result in one extreme limitation or two marked limitations in a broad area of functioning. She noted that Plaintiff had only mild limitations in understanding, remembering, or applying information and adapting or managing himself and moderate impairments in interacting with others and concentrating, persisting, or maintaining pace. Additionally, she found "the medical record does not demonstrate the level of clinical failure or decomposition" necessary to satisfy the Listing's paragraph C criteria. *Id.* at 27.

At Step Four, the ALJ determined Plaintiff had the RFC to:

perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: he can occasionally climb ramps and stairs, but never ladders, ropes or scaffolds; he can occasionally balance, stoop, kneel, crouch and crawl; he can tolerate occasional exposure to and can occasionally work around extreme vibration, and hazards such as moving machinery or unprotected heights; he cannot ambulate on uneven terrains; he can perform work that involves simple routine tasks requiring no more than short, simple instructions and simple work-related decision making, with few work place changes; and he can maintain occasional contact with the general public of a brief, superficial and incidental nature, and occasional interaction with supervisors and co-workers.

*Id.*

At the April 14, 2023 hearing, the ALJ asked the VE hypothetical questions regarding the jobs available to a person of Plaintiff's age, education level, and RFC. The VE opined that Plaintiff would not be able to return to past work as a maintenance worker. When asked what other jobs would be available, the VE listed inspector and hand packager, garment sorter, and folder. When asked what jobs would be available to an individual with Plaintiff's "age, education and work experience" who "has the [RFC] or would have the [RFC], prior to the age of 50, to perform sedentary work," the VE listed compact assembler, inspector, and final assembler. *Id.* at 64. VE Wang further opined

4

that the typical tolerance for unexcused or unscheduled absences is "one or two absenteeism a month but . . . not every month[,]" *id.* at 65, that the typical tolerance for off-task time was no more than ten percent of the workday. She testified that if Plaintiff needed to rely on an assistive device such as a cane to ambulate to and from a workstation, the inspector and hand packager and garment sorter jobs would be available, but only in half the number of available jobs. The same sedentary jobs would also be available.

Considering Plaintiff's age, education, work experience, and RFC, ALJ Supergan determined at Step Five that jobs exist in significant numbers in the national economy which Plaintiff could perform, including inspector and hand packager (approximately 57,000 jobs nationally), garment sorter (approximately 26,000 jobs nationally), and folder (approximately 94,000 jobs nationally). As a result, the ALJ concluded Plaintiff was not disabled.

### III.    Conclusions of Law and Analysis.

#### A.    Standard of Review.

In reviewing the Commissioner's decision, the court "conduct[s] a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Cichocki v. Astrue*, 729 F.3d 172, 175-76 (2d Cir. 2013) (citation and internal quotation marks omitted). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (internal quotation marks omitted).

It is the Commissioner who resolves evidentiary conflicts, and the court "should not substitute its judgment for that of the Commissioner." *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998); *see also Aponte v. Sec'y, Dep't of Health & Hum. Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984) (noting "genuine conflicts in the medical evidence are for the Secretary to resolve"). Even if the court could draw different conclusions after an independent review of the record, the court must uphold the Commissioner's decision

when it is supported by substantial evidence and when the proper legal principles have been applied. *See* 42 U.S.C. § 405(g); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.").

The court does not defer to the Commissioner's decision if it "is based on an error of law." *Juarez ex rel. R.R.O. v. Saul*, 800 F. App'x 63, 64 (2d Cir. 2020) (summary order). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 732 (S.D.N.Y. 2018) (internal quotation marks omitted) (quoting *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009)).

## B.     Whether the ALJ Erred in Assessing Dr. Reddy's and Dr. Jhaveri's Opinions Regarding Plaintiff's Standing and Walking Limitations.

Plaintiff argues that ALJ Supergan committed legal error by "fail[ing] to conduct a proper supportability and consistency analysis" when weighing the opinions of Dr. Reddy and Dr. Jhaveri and that her evaluation of these opinions is not supported by substantial evidence. (Doc. 9-1 at 13.) Specifically, Plaintiff contends that the ALJ failed to explain why Dr. Reddy's opinion that Plaintiff could stand or walk for six hours during a workday was more persuasive than Dr. Jhaveri's opinion that he could only do so for two hours. According to Plaintiff, this error was harmful because the limitations endorsed by Dr. Jhaveri would limit Plaintiff to sedentary work and would support finding him disabled. The Commissioner counters that ALJ Supergan's opinion, read as a whole, sufficiently addresses the consistency and supportability factors and is supported by substantial evidence.

"When making a determination of disability, an ALJ must consider all of the available evidence in the individual's case record, including the opinions of medical sources." *Karen S. v. Comm'r of Soc. Sec.*, 2020 WL 4670911, at *13 (D. Vt. Aug. 11, 2020) (internal quotation marks, alteration, and citation omitted). An ALJ must articulate *how* they considered medical opinions and prior administrative findings, as well as *how persuasive* they found them. 20 C.F.R. §§ 404.1520c(a)-(b), 416.920c(a)-(b).

6

An ALJ "will not defer or give any specific evidentiary weight . . . to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* §§ 404.1520c(a), 416.920c(a). Instead, an ALJ must consider each medical opinion or prior administrative finding in the record and evaluate its persuasiveness in accordance with five factors: (1) supportability; (2) consistency; (3) relationship with the claimant (including: (i) length of treatment relationship, (ii) frequency of examinations, (iii) purpose of treatment relationship, (iv) extent of treatment relationship, and (v) examining relationship); (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative medical finding. *See id.* §§ 404.1520c(c), 416.920c(c).

The factors of supportability and consistency "are the most important factors [an ALJ] consider[s]" when determining the persuasiveness of a medical opinion. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). An ALJ must therefore articulate how he or she considered the supportability and consistency of a medical opinion and may, but need not, address the remaining three factors. *Id.* "[W]hen the record contains competing medical opinions, it is the role of the Commissioner to resolve such conflicts." *Diana C. v. Comm'r of Soc. Sec.*, 2022 WL 1912397, at *7 (S.D.N.Y. Apr. 11, 2022) (citing *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002)). Supportability refers to "how well a medical source supported and explained their opinion[,]" and "consistency is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." *Vellone ex rel. Vellone v. Saul*, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *report and recommendation adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021).

The court "may not 'create post-hoc rationalizations to explain the Commissioner's treatment of evidence when that treatment is not apparent from the Commissioner's decision itself.'" *Petersen v. Astrue*, 2 F. Supp. 3d 223, 234 (N.D.N.Y. 2012) (quoting *Grogan v. Barnhart*, 399 F.3d 1257, 1263 (10th Cir. 2005)); *see Dunsford v. Comm'r of Soc. Sec.*, 2023 WL 2242083, at *7 (N.D.N.Y. Feb. 27, 2023) (explaining that court "will 'judge the propriety of [the ALJ] solely by the grounds invoked by [the ALJ]' rather than the Commissioner's subsequent ad-hoc justification") (alterations in

7

original) (quoting *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196 (1947)). For this reason, the court describes the opinions at issue in more detail than provided by the ALJ before addressing the ALJ's analysis of them.

On November 13, 2021, Raymond Leung, M.D., conducted an internal medicine consultative examination of Plaintiff as part of an evaluation of his claim. Plaintiff advised that he injured his neck in a motor vehicle accident and underwent a neck fusion in 2013, fractured his heels in 2006 and underwent surgery, and had arthritis in his ankles. He stated he uses a cane occasionally and can walk five blocks and lift ten pounds. Upon examination, Dr. Leung noted that Plaintiff "walks with a mild limp[,]" could walk fifty feet unassisted, could not tandem walk or heel walk, could hop on his left leg but not his right leg, and could toe walk and squat. (Doc. 8-1 at 636.) He further noted "decreased range of motion in the cervical spine and both ankles." *Id.*

On November 29, 2021, Dr. Reddy opined that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds; was limited in his ability to push or pull in the lower extremities but not upper extremities; and could occasionally climb ramps, stairs, ladders, ropes, or scaffolds and crawl. He found that Plaintiff could stand or walk with normal breaks for about six hours and sit for about six hours in an eight-hour workday. To support his opinion, Dr. Reddy cited x-rays from June 2018 "show[ing] extensive plate-screw fixation hardware and moderate [degenerative joint disease] at tibiotalar joint of the [right lower extremity] and extensive plate and screw fixation hardware and mild [degenerative joint disease] of the [left lower extremity][,]" x-rays from December 2018 "show[ing] severe degen[erative] changes at the ankle of the [right lower extremity] and progressive degen[erative] changes in the [left lower extremity]." In addition, Dr. Reddy cited Dr. Leung's findings and Plaintiff's chronic pancreatitis *Id.* at 83. Dr. Reddy also noted that, according to Dr. Leung's report, Plaintiff had decreased range of motion in his ankles, with his right ankle being "essentially fused." *Id.*

On June 15, 2022, Roopa K. Karri, M.D., conducted an internal medicine consultative examination at the state agency's request. Dr. Karri listed arthritis, neck pain,

8

chronic pancreatitis, and depression as Plaintiff's chief complaints. She noted that he suffered bilateral heel fractures in 2006 after falling off a roof and still had an open wound on his right ankle, "which leaks every day." *Id.* at 643. Plaintiff reported that he was advised to have reconstructive surgery but could not afford it, "walks on his tippy toes usually[,]" and "has bilateral ankle pain with swelling every day." *Id.* Dr. Karri also noted Plaintiff's neck fusion related to his automobile accident in 2011 as well as his chronic pancreatitis. Plaintiff reported that he had pain in his right upper quadrant that flared up every three to six months and that he used a cane occasionally. He said he drank heavily for two and a half years and recently cut down to about three to four beers per day, which he used to cope with pain. He also reported smoking cigarettes — "[one] pack per day for [forty] years." *Id.*

Upon examination, Dr. Karri observed an open wound in Plaintiff's right lateral ankle with "purulent discharge 1 cm in size" as well as hyperpigmentation in his right lateral ankle. (Doc. 8-1 at 644.) She described Plaintiff's gait as slow with a limp, stated he was able to get on and off the exam table and noted "tenderness and swelling in right ankle which was warm to touch." *Id.* at 645. She reported less than normal range of motion in Plaintiff's right shoulder, ankles, and cervical and lumbar spine and that Plaintiff could walk fifty feet without assistance and toe walk but could not heel walk or squat. She indicated that Plaintiff was not taking medication for his pancreatitis because he could not afford it.

Dr. Karri reviewed x-rays of Plaintiff's right ankle and cervical spine. With regard to Plaintiff's right ankle, she observed "bone fusion of the anterior talus and distal tibia" and "[s]urgically repaired calcaneus with several screws" with "[m]oderate/severe arthritic changes to the ankle mortise joint, lateral fibular joint, and medial tibia joint." *Id.* at 641. With regard to Plaintiff's spine, she observed "[s]urgical fusion of C5-C7 and bony fusion C3-C5 anterior." *Id.*

On July 7, 2022, Dr. Jhaveri provided a medical opinion to support reconsideration of Plaintiff's disability claim. Like Dr. Reddy, Dr. Jhaveri opined that Plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds and that

he was limited in being able to push and/or pull in his lower extremities but not upper extremities. She found that Plaintiff could occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and stoop, kneel, crouch, and crawl. Dr. Jhaveri agreed with Dr. Reddy's opinion that Plaintiff could sit with normal breaks for about six hours in an eight-hour workday but found that Plaintiff could stand or walk for only two hours. To support these limitations, she cited the x-rays of Plaintiff's spine and right ankle; Dr. Karri's findings regarding Plaintiff's arthritis, the open wound in Plaintiff's ankle, and his chronic pancreatitis; his self-reported symptoms of not being able to lift his right arm, left arm numbness, and finger cramping as well as his report that he used a cane occasionally; and Plaintiff's right ankle hyperpigmentation. *Id.* at 105.

Between 2018 and 2023, Plaintiff went to the hospital several times for his pancreatitis and foot pain. On December 24, 2018, he presented at the emergency department of Bethesda Health East in Boynton Beach, Florida with increasing pain in his right foot. Based on x-rays of Plaintiff's right ankle and foot, Lori J. Jalens, M.D., reported "progressive loss of height at the ankle mortise with possible collapse of the talus[,]" "osteopenia" in "the regional bones[,]" "severe degenerative changes at the ankle mortise[,]" and "[d]egenerative changes . . . at the first metatarsophalangeal joint and first interphalangeal joint." *Id.* at 560. Treatment notes also mentioned an unhealing wound related to the previous surgical repair of Plaintiff's right heel bone that had remained unchanged for twelve years.

On April 30, 2019; February 2, 2020; May 7, 2020; May 6, 2021; July 2, 2021; and December 24, 2022, Plaintiff went to the emergency room for abdominal pain, vomiting, and other symptoms associated with a pancreatitis flare-up. (Doc. 8-1 at 501, 592, 608, 804, 821, 828.) A treatment note by Danielle Robillard, APRN, from Plaintiff's December 24, 2022 visit to Rutland Regional Medical Center reported that he had a history of recurrent pancreatis beginning on 2014 and typically suffered flares after bingeing on alcohol or eating fatty and greasy food. Several days ago, he had gone on a two-day binge of beers. The note mentioned Plaintiff taking "[eight to twelve] ibuprofen tablets daily to treat his chronic feet pain[.]" *Id.* at 804.

Plaintiff saw a primary care provider for the first time since 2019 on February 9, 2023, reporting pancreatitis, chronic wound on heel, back pain, and hyperlipidemia. Nicole Reda APRN noted that Plaintiff walked with a normal gait and had intact motor strength in his upper and lower extremities. On March 1, 2023, Plaintiff saw APRN Reda for his annual exam with a chronic wound "weeping a clear to yellow drainage[.]" *Id.* at 917. He was also experiencing neck pain and stiffness and reported that he did not engage in physical activity due to pain. *Id.* Later that month, Plaintiff underwent hernia repair surgery.

Brad Jimmo, M.D., saw Plaintiff on March 30, 2023 to evaluate his surgical site and the chronic wound on his foot. Dr. Jimmo noted that Plaintiff's "nonhealing wound for the last many years is due to chronically infected bone and hardware in his right lower extremity" and observed "visible hardware present in the base of this wound." *Id.* at 955. He referred Plaintiff to an orthopedic doctor for evaluation of hardware removal, which he explained was the only way for the wound to heal. On May 11, 2023, Plaintiff had surgery to remove the hardware in his right foot. He was hospitalized from May 16 to May 22, 2023, for a bacterial infection related to the hardware removal. *Id.* at 1236.

In her August 30, 2023 opinion, ALJ Supergan summarized Plaintiff's medical history up to his May 2023 hardware removal and subsequent treatment for a postoperative infection. She did not assign any specific weight to Dr. Leung's and Dr. Karri's opinions because they "did not opine as to how the [Plaintiff's] impairments might limit his ability to function in the workplace[.]" *Id.* at 32. She did not address Dr. Reddy's or Dr. Jhaveri's opinions by name, although the parties appear to agree that, in comparing the opinions of "[t]he state agency medical consultants at the initial level" and those of "[t]he state agency medical consultants at the reconsideration level[,]" the ALJ was referring to Dr. Reddy's and Dr. Jhaveri's opinions, respectively. (Doc. 8-1 at 32.) "Given the inconsistencies between these opinions," ALJ Supergan found them "only somewhat persuasive." *Id.* She further stated that "[t]he limitation to less than two hours of walking or standing is inconsistent with the [Plaintiff's] own hearing testimony, that he could likely stand for an hour at a time, and repeat that four times in a day" and that "the

11

manipulative limitations [in Dr. Jhaveri's opinion] are simply not supported by the medical evidence." *Id.* In contrast, she found Dr. Reddy's opinion limiting Plaintiff "to light exertion, with additional postural limitations, . . . to be generally persuasive." *Id.*

Even where the ALJ addressed Dr. Jhaveri's and Dr. Reddy's opinions, albeit not by name, it is difficult to determine whether her conclusions are supported by substantial evidence. For example, the ALJ found Dr. Jhaveri's opinion less persuasive in part because of its inconsistency with Plaintiff's testimony that he could stand for an hour at a time and repeat that four times in a day. Plaintiff, however, testified that he could stand for about an hour only with his "right foot on [his] tippy-toe" and that he could repeat this "three, maybe four times a day[.]" (Doc. 8-1 at 58.) This testimony is not inconsistent with Dr. Jhaveri's opinion that Plaintiff could only stand or walk for two hours with normal breaks in an eight-hour workday. *See Smith v. Comm'r of Soc. Sec.*, 337 F. Supp. 3d 216, 223-24 (W.D.N.Y. 2018) (finding ALJ mischaracterized Plaintiff's testimony by referencing the "wide range of activities of daily living" he could do without acknowledging that plaintiff needed to take breaks when performing these activities); *Ortiz v. Colvin*, 2016 WL 4005605, at *9 (D. Conn. July 26, 2016) (finding ALJ's conclusion that plaintiff could work part-time mischaracterized her testimony that she could "intermittently work at most two hours a day, three days a week"). Although ALJ Supergan apparently found Plaintiff not entirely credible, citing inconsistencies between his testimony and the record, Dr. Jhaveri's opinion cites objective evidence and does not rely solely on Plaintiff's self-reported symptoms.

It is equally difficult to determine the ALJ's rationale for concluding that Dr. Reddy's opinion that Plaintiff could stand or walk for six hours in a workday was "generally persuasive." (Doc. 8-1 at 32.) Although the ALJ found the state agency medical consultants' opinions were "only somewhat persuasive" because of their inconsistencies with each other, she nevertheless found the "opinions that limit the claimant to light exertion . . . to be generally persuasive" even though Dr. Jhaveri's and Dr. Reddy's opinions differ regarding whether Plaintiff could perform light or only sedentary work. *Id.*; *see also Vogelsang v. Comm'r of Soc. Sec.*, 657 F. Supp. 3d 450, 465

(S.D.N.Y. 2023) (finding error in part based on "the ALJ's opinion [being] internally inconsistent"). The ALJ did not otherwise discuss the consistency of Dr. Reddy's opinion with the record. *See Loucks v. Kijakazi*, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022) (summary order) (finding ALJ erred by failing to "address the [medical] opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was").

Generally, "an ALJ's failure to fully express her reasoning does not justify remand so long as the [c]ourt can glean the rationale of the decision." *Cheryl A. v. Comm'r of Soc. Sec.*, 2021 WL 1022442, at *2 (W.D.N.Y. Mar. 17, 2021) (internal quotation marks omitted) (quoting *Golibersuch v. Comm'r of Soc. Sec.*, 2020 WL 409991, at *4 (W.D.N.Y. Jan. 24, 2020)); *see also Loucks*, 2022 WL 2189293, at *2 ("Despite the ALJ's procedural error, we could affirm if a searching review of the record assures us that the substance of the [regulation] was not traversed.") (alteration in original) (internal quotation marks omitted) (quoting *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019)). Here, the court cannot do so. The Commissioner cannot supply the rationale post-decision.[2]

Dr. Jhaveri and Dr. Reddy were the only doctors who opined regarding how many hours Plaintiff could stand or walk in an eight-hour workday. The ALJ's statement that "nothing in the hearing level record . . . would preclude the [Plaintiff] from performing light work" ignores Dr. Jhaveri's opinion, which the ALJ found "somewhat persuasive[,]" that Plaintiff was limited to standing or walking for two hours in an eight-hour workday. (Doc. 8-1 at 31-32); *see Shannon L. v. Comm'r of Soc. Sec.*, 2023 WL 2742077, at *3 (N.D.N.Y. Mar. 31, 2023) (finding ALJ's statement that "no evidence" supported plaintiff's need for a cane erroneous because medical provider had opined that "[p]laintiff needed a cane to stand and balance") (internal quotation marks omitted); *see also Juanita A. v. Comm'r of Soc. Sec.*, 2023 WL 2493810, at *3 (W.D.N.Y. Mar. 14, 2023) (noting

---

[2] *See Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 24 (2020) ("An agency must defend its actions based on the reasons it gave when it acted."); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) ("The courts may not accept appellate counsel's *post hoc* rationalizations for agency action[.]") (emphasis in original).

that "the full range of light work requires standing or walking, off and on, for a total of approximately [six] hours of an [eight]-hour workday") (internal quotation marks omitted) (quoting Social Security Ruling 83-10, 1983 WL 31251, at *6).

Treatment notes over the course of multiple years consistently document a non-healing wound on Plaintiff's right heel. The ALJ's description of Plaintiff's "consistent complaints of foot and ankle pain" as having "now been addressed with the recent surgical revisions" mischaracterizes the record. (Doc. 8-1 at 31). Plaintiff underwent surgery in May 2023, the month after his hearing, to remove the hardware in his right foot, but none of the subsequent medical evidence indicates whether his foot and ankle pain resolved afterwards. Even the ALJ's RFC does not reflect that conclusion because it includes limitations based upon Plaintiff's foot and ankle impairments. Because "the ALJ's consideration of the relevant factors" cannot "be gleaned from [her] decision as a whole[,]" her opinion reflects legal error. *John L. M. v. Kijakazi*, 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022).

Although both Dr. Reddy's and Dr. Jhaveri's opinions referred to objective medical evidence, such as x-rays revealing arthritis in Plaintiff's ankle and testing documenting a limited range of motion in his ankles, the ALJ did not address whether this evidence supported or failed to support either doctor's opinions regarding how many hours Plaintiff could stand or walk in a workday. Nor did she otherwise address the adequacy of the doctors' explanations for their opinions. Because this court cannot discern the basis for the ALJ's RFC or determine how she evaluated the supportability and consistency of Dr. Reddy's and Dr. Jhaveri's opinions, remand is required. *See Gina B. v. Comm'r of Soc. Sec.*, 2024 WL 4262640, at *6 (D. Conn. Sept. 23, 2024) ("Remand may be appropriate where an ALJ's conclusory statements regarding supportability 'offer no insight into how well [either doctor] supported and explained their opinion.'") (internal quotation marks omitted) (alteration in original) (quoting *Ayala v. Kijakazi*, 620 F. Supp. 3d 6, 31 (S.D.N.Y. 2022)); *Karli D. v. Comm'r of Soc. Sec.*, 2023 WL 3004012, at *7 (N.D.N.Y. Apr. 19, 2023) (finding error where "the ALJ's analysis does not mention supportability at all, much less address 'the objective medical evidence and supporting

14

explanations' presented by [medical provider] to support his opinion") (quoting 20 C.F.R.
§ 416.920c(c)(1)).

The error as to the ALJ's treatment of these opinions was not harmless because Dr.
Jhaveri opined that Plaintiff was limited to sedentary work. Although the VE at Plaintiff's
hearing testified that the sedentary jobs of compact assembler, inspector, and final
assembler would be available to Plaintiff, it was not clear from the ALJ's phrasing of her
question to the VE whether his answer applied to individuals above the age of fifty, and
Plaintiff turned fifty during the relevant time period, putting him in a different age
category. *See Woods v. Colvin*, 218 F. Supp. 3d 204, 207 (W.D.N.Y. 2016)
(acknowledging potential impact of age category on disability determination). Remand is
therefore necessary.

For these reasons, the court GRANTS Plaintiff's motion to reverse the decision of
the Commissioner.

## C.    Whether the ALJ Erred in Excluding Manipulative Limitations from the RFC.

Plaintiff argues that the ALJ's rejection of the manipulative limitations in Dr.
Jhaveri's opinion as unsupported by medical evidence "misconstrue[d] the record." (Doc.
9-1 at 16.) The Commissioner responds that substantial evidence supports the ALJ's
exclusion of manipulative limitations from the RFC.

At Plaintiff's November 13, 2021 examination, Dr. Leung noted that Plaintiff
"could oppose the thumb to each finger in both hands" and rated his pinch strength, arm,
and grip strength as 4+/5 on the right and 5/5 on the left. (Doc. 8-1 at 637.) Dr. Reddy's
November 29, 2021 opinion similarly identified no manipulative limitations. At
Plaintiff's June 15, 2022 evaluation, Dr. Karri found "[s]ensory decreased to pin prick in
right medial [three] fingers" and rated Plaintiff's grip strength as 3/5 in his right hand and
4/5 in his left hand, finding moderate and mild limitations in his gross and fine
manipulations on the right and left sides, respectively. *Id.* at 644, 648. She also noted
Plaintiff's self-report that he could not lift his right arm; suffered cramping in his third,
fourth and fifth fingers; had numbness in his left arm for the past three months; and had

15

weakness in his hands. Citing Dr. Karri's findings, Dr. Jhaveri stated in her July 7, 2022 opinion that Plaintiff was limited on the right side in reaching overhead and limited on both sides in handling and fingering.

The ALJ rejected Dr. Jhaveri's manipulative limitations as "simply not supported by the medical evidence." *Id.* at 32. She also noted that "[t]he records . . . do not document significant complaints of pain, weakness, or numbness in the [Plaintiff's] hands (outside of the broken finger suffered in a physical altercation)" and that though Plaintiff "has previously alleged impairments due to . . . a degenerative condition in his neck, causing pain, numbness, tingling, weakness, and reduced function in his right arm and hand[,]" he did not mention this condition in his hearing testimony. *Id.* at 28, 31.

Plaintiff argues that ALJ Supergan misconstrued the record when she stated that the manipulative limitations in Dr. Jhaveri's opinion were "simply not supported by the medical evidence" because they were supported by Dr. Karri's findings. *Id.* at 32. "The fact that there is competing evidence in the record relating to a specific impairment does not render the ALJ's determination erroneous." *Ciara B. v. Comm'r of Soc. Sec.*, 610 F. Supp. 3d 515, 520 (W.D.N.Y. 2022). The ALJ accurately noted that Plaintiff's medical records generally do not document hand pain, weakness, or numbness outside of isolated incidents. In April of 2019, Plaintiff suffered injury to his left hand and wrist from a fall off a ladder, and in October of the same year, he fractured a finger after punching another individual. *Id.* at 521, 851.

ALJ Supergan further noted that Plaintiff did not mention manipulative limitations in his hearing testimony, although she acknowledged that he previously alleged impairments on this basis.[3] When asked by the ALJ to tell her "in your own words[] why you believe you're disabled and you can't work anymore[,]" Plaintiff only described his

_____

[3] Plaintiff's Form SSA-3373 Function Report completed on September 17, 2021, described the following manipulative limitations, among other impairments, in response to the question "How do your illnesses, injuries, or conditions limit your ability to work?": "THE PINCHED NERVE AT THE BASE OF MY SKULL AFFECTS MY RIGHT ARM AND FINGERS. I CAN'T LIFT MY ARM PAST MY SHOULDER WITHOUT PAIN AND MY HAND I CONSTANTLY DROP THINGS." (Doc. 8-1 at 333.)

foot and pancreatic issues. (Doc. 8-1 at 49.) An ALJ may consider Plaintiff's testimony, or lack thereof, in determining whether to include an alleged limitation in the RFC. *See Martinez Reyes v. Comm'r of Soc. Sec.*, 2019 WL 3369255, at *7 (W.D.N.Y. July 26, 2019) (finding ALJ's failure to address medical "opinion that plaintiff was seriously limited in his ability to interact with supervisors" harmless where plaintiff "did not testify that he had difficulties interacting with supervisors" and "indicated that he has never lost a job because of problems getting along with people"); *Colbert v. Comm'r of Soc. Sec.*, 313 F. Supp. 3d 562, 581 (S.D.N.Y. 2018) (finding ALJ "properly decline[d] to attribute pushing, pulling, and handling limitations to [plaintiff] associated with her wrist impairment" where plaintiff "did not mention her wrist during her testimony at the hearing, even though she was specifically asked about her limitations").

Because the ALJ's determination that no manipulative limitations were required for Plaintiff's RFC was supported by substantial evidence, even if there is also evidence to the contrary, she did not err, and remand is not warranted on this basis. *See Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015) (summary order) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits"); *Taylor v. Comm'r of Soc. Sec.*, 711 F. Supp. 3d 148, 161 (E.D.N.Y. 2024) (finding ALJ's RFC supported by substantial evidence because, "compared against the available medical opinions, [plaintiff's] subjective testimony, and the other evidence in the record, . . . a reasonable factfinder could have formulated the same RFC"). Nonetheless, because a remand is ordered, in issuing a new decision, the ALJ should determine whether manipulative limitations are warranted.

**D.    Whether the ALJ Erred in Assessing Dr. Voss's, Dr. DiFonso's, and Dr. Froman's Opinions.**

Plaintiff contends that the ALJ erred by "fail[ing] to conduct any supportability and consistency analysis" of the opinions authored by Dr. Voss, Dr. DiFonso, and Dr. Froman, all of whom opined regarding Plaintiff's mental limitations. (Doc. 9-1 at 19.) In particular, he asserts the ALJ failed to address Dr. Voss's and Dr. DiFonso's opinions

17

regarding Plaintiff's moderate limitations in concentration, persistence, and pace and interactions with others; his marked limitation in interaction with the general public; and his need for rest breaks. He further contends the ALJ failed to address Dr. Froman's opinion that "Plaintiff would not be able to perform one or two step assemblies at a competitive rate" or "withstand the stress associated with customary employment." *Id.* He asserts this error was harmful because these limitations support a finding that he cannot perform any substantial gainful activity.

On June 4, 2018, Plaintiff was admitted to the hospital at JFK North Campus in West Palm Beach, Florida, after calling the sheriff's office "stating that he did not want to live anymore and is having a mental meltdown." (Doc. 8-1 at 491.) According to treatment notes by Efrain Acosta-Leon, M.D., dated June 6, 2018, Plaintiff had "drank around [eighteen] beers and was holding a knife contemplating to stab himself." *Id.* at 466. He had recently broken up with his girlfriend and reported poor impulse control, anger issues, mood swings, irritability, insomnia, relationship issues, poor coping skills, depression, feeling helpless and hopeless, auditory hallucinations, and active suicidal ideation. His mental status exam noted his appearance was "bizarre, disheveled, malnourished, poor grooming, very thin"; his mood was "angry, anxious, depressed, elevated, frustrated, hopeless, irritable"; his affect was "inappropriate, somewhat constricted"; and his thought content consisted of "obsessions, self[-]destructive ideation, violent ideations[.]" *Id.* at 468-69. Dr. Acosta-Leon also noted that Plaintiff "present[ed] an imminent danger to self and/or others and require[d] inpatient hospitalization base[d] upon recent behaviors." *Id.* at 471. Plaintiff "responded well to the medication and milieu" and was discharged on June 8, 2018. *Id.* at 455.

On November 5, 2019, Plaintiff went to the JFK Medical Center for "[b]izarre behavior, [s]uicidal ideation, [and v]iolent behavior[.]" *Id.* at 836. According to a treatment note by Roberto A. Lugo, PA, Plaintiff reported alcohol and marijuana use and psychiatric symptoms of auditory hallucinations, homicidal ideation, and suicidal ideation. Another treatment note from the same date listed a primary impression of "[p]sychosis due to alcohol[.]" (Doc. 8-1 at 842.)

18

At the state agency's request, Dr. Froman conducted a psychological evaluation of Plaintiff on October 22, 2021. At the time, Plaintiff was living with his sister in Illinois, after "having lived in Florida for [thirty-five] years[] and [having] been homeless for some of those years." *Id.* at 629. Dr. Froman described Plaintiff's as exhibiting "victimization attitudes . . . as well as a great deal of anger and rage[,]" noting that "he is unafraid of beating people to a pulp if they cross him[] or suggest something negative to him" and "seems to have no social conscience regarding it[] and feels fully justified in harming others[.]" *Id.* at 630. Dr. Froman noted that Plaintiff "has been actively suicidal, with multiple attempts" and that he struggled to sleep and experienced flashbacks after having witnessed his friend being shot to death. *Id.* He reported Plaintiff's mental status as oriented to person, place, and time and "in good contact with reality." *Id.* at 631.

Dr. Froman diagnosed Plaintiff with alcoholic encephalopathy, chronic alcohol dependence, chronic major depressive disorder, antisocial personality disorder, intermittent explosive disorder, and borderline personality traits based on "[h]is difficulties in some information retrieval, making sense of this world, and being able to restrain himself[.]" *Id.* He provided the following description of the connection between Plaintiff's physical condition and his mental health:

> [Plaintiff] is in a circular pattern in dealing with his alcoholism and pancreatitis. When he feels great pain in his body, he will drink. The drinking sets off a flare of pancreatitis, and he has to be hospitalized. This seems to be a never-ending cycle, having taken place four times in just this year. He has not had any contact with a local physician who can help him, and often finds himself disparaging doctors who might ask him "what treatment work[ed] for you in the past?" He feels negative about them, and feels that they should not need to ask him what worked for him.
>
> He has an extraordinarily strong rage response. He has no hesitation about beating other people up, and in essence, following the pattern that he saw his dad portray. He has little if any sense of contrition, guilt, or upset when yelling or screaming at others, berating them, or being hostile towards [them]. Rather, it appears to be ego syntonic, with little ability on his part to correct. His chronic use of alcohol, over the years, coupled with his physical issues, suggest that he has already begun some decompensation because of his usage.

*Id.* Dr. Froman concluded that "[g]iven the myriad of symptoms that he presents, it is

unlikely that [Plaintiff] would be able to perform one or two step assemblies at a competitive rate." He further opined that Plaintiff "does not relate well to others, tending to 'snap' at the slightest provocation[,]" and that "[w]hile he can understand oral and written instructions, and manage benefits, he seems unlikely [to be] able to withstand the stress associated with customary employment." (Doc. 8-1 at 631.)

On October 25, 2021, state agency consulting psychologist Dr. Voss found Plaintiff suffered from mild impairment in the areas of understanding, remembering, or applying information and adapting or managing oneself and moderate limitations in the areas of interacting with others and concentrating, persisting, or maintaining pace. He gave "[s]ignificant consideration" to Dr. Froman's findings as "the most recent [mental status exam] and evaluation of the [plaintiff]." *Id.* at 81. He also found that Plaintiff was markedly limited in the ability to interact appropriately with the general public and moderately limited in the ability to maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. He found Plaintiff was moderately limited in his ability to accept instructions and respond appropriately to criticisms from supervisors and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.

In explaining his conclusions, Dr. Voss noted that "[o]verall, the [plaintiff's] [medically determinable impairment] would not interfere significantly with the ability to complete routine work tasks, but pain and physical limitations could interfere episodically with his work performance and/or require more rest breaks than commonly occur in an ordinary workplace." *Id.* at 84. On reconsideration, consulting psychologist Dr. DiFonso found the same limitations as Dr. Voss in a July 14, 2022 opinion.

Dr. DiFonso did not elaborate on Dr. Voss's explanations except by summarizing Dr. Karri's observations of Plaintiff's mental status, behavior, and appearance at his June 15, 2022 evaluation. Dr. DiFonso noted that Plaintiff's "[m]emory, appearance, behavior

and ability to relate during the examination were normal" and that he "was appropriate, polite, pleasant and cooperative and able to relate a clear, concise, coherent medical history without apparent cognitive difficulties." *Id.* at 103. She noted Dr. Karri's findings that Plaintiff had a normal affect, with "no signs of depression, agitation, irritability, or anxiety" and appeared well-groomed with good hygiene. *Id.* She also noted Plaintiff's history of depression.

In her August 30, 2023 opinion, ALJ Supergan found the portion of Dr. Froman's opinion stating that Plaintiff would be unlikely to "withstand the stress associated with customary employment" unpersuasive because it is "vague and encroaches on the central question reserved to the Commissioner in this evaluation." *Id.* at 32. She did not mention Dr. Voss's or Dr. DiFonso's opinions other than a statement that she found the state agency consultants' opinions regarding Plaintiff's ability to manage complex tasks and interpersonal interactions "generally persuasive" and supported by the medical record. (Doc. 8-1 at 32.)

"Generally, ALJs must provide reasons if they do not accept a portion of an opinion to which they had given significant weight." *Koza v. Comm'r of Soc. Sec.*, 692 F. Supp. 3d 197, 204 (S.D.N.Y. 2023). An ALJ need not, however, "'adopt each and every limitation identified' merely because she gave weight to an opinion." *Chasity A. v. Kijakazi*, 2022 WL 1984148, at *3 (N.D.N.Y. June 6, 2022) (quoting *Jennifer Lee W. v. Berryhill*, 2019 WL 1243759, at *4 (N.D.N.Y. Mar. 18, 2019)). Where "the ALJ could have provided a more detailed explanation for h[er] reasoning with regard to h[er] consideration of the persuasiveness" of certain medical opinions, "the Commissioner's decision, when supported by substantial evidence, can be affirmed 'where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole.'" *Frederick C. S. v. Comm'r of Soc. Sec.*, 2024 WL 4278951, at *9 (N.D.N.Y. Aug. 30, 2024) (quoting *John L. M. v. Kijakazi*, 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022)); *see also Jaret B. v. Comm'r of Soc. Sec.*, 2024 WL 1014051, at *7 (W.D.N.Y. Mar. 8, 2024) (noting that ALJ's "failure to provide a clear explanation" for conflict between RFC finding and medical opinion "may not require reversal if the [c]ourt can

21

glean the rationale for the ALJ's decision").

Although she rejected the portion of Dr. Froman's report stating that Plaintiff likely could not "withstand the stress associated with customary employment" as unpersuasive because it was too vague and encroaches on the central question of disability, (Doc. 8-1 at 32), the ALJ did not address whether she found the remainder of Dr. Froman's opinions to be persuasive. *See Hahn v. Saul*, 2023 WL 4975970, at \*4 (E.D.N.Y. Aug. 3, 2023) (noting that "ALJ is required to consider *all* of the medical opinion evidence in the record") (emphasis in original). Plaintiff was hospitalized twice for posing a danger to himself or others, which supports Dr. Froman's assessment of severe psychological symptoms. In addition, Dr. Froman opined that Plaintiff was unable to perform one- or two-step assemblies, but the ALJ failed to include this limitation in the RFC without explaining why she rejected it.

To the extent the ALJ may have found portions of Dr. Froman's opinions unpersuasive because of their inconsistency with Dr. Voss's and Dr. DiFonso's opinions, the court cannot glean the ALJ's rationale because she referred to the reviewing psychologists' opinions only under the umbrella of "[t]he state agency medical consultants" or "other opinions" and stated, in conclusory fashion, that they are supported by the record. (Doc. 8-1 at 32); *see Agostino v. Kijakazi*, 2024 WL 1259247, at \*4-5 (E.D.N.Y. Mar. 25, 2024) (finding that ALJ "summarily address[ing] all of the medical evidence in [p]laintiff's workers' compensation file" was "insufficient to satisfy the ALJ's duty" to discuss supportability and consistency of every medical opinion). Dr. Voss gave "significant consideration" to Dr. Froman's findings and endorsed several of them in finding Plaintiff had marked and moderate mental limitations. (Doc. 8-1 at 90.) The ALJ accounted for some of these limitations assessed by Drs. Voss and DiFonso in Plaintiff's RFC; for example, by limiting him to "simple routine tasks requiring no more than short, simple instructions and simple work-related decision[-]making, . . . occasional contact with the general public of a brief, superficial[,] and incidental nature, and occasional interaction with supervisors and co-workers." (Doc. 8-1 at 27); *see Phillip D. v. Comm'r of Soc. Sec.*, 2022 WL 2872646, at \*4 (W.D.N.Y. July 21, 2022) (finding that RFC

limiting plaintiff to "simple, rote, three-step tasks" accounted for moderate limitations in sustaining concentration and performing tasks at consistent pace); *Richard B. v. Comm'r. of Soc. Sec.*, 2021 WL 4316908, at *8 (W.D.N.Y. Sept. 23, 2021) (finding RFC limiting plaintiff to occasional interactions with supervisors, co-workers, and the public was consistent with "finding of marked limitations in interacting with others"). She did not, however, address Dr. Voss's and Dr. DiFonso's opinions that Plaintiff may "require more rest breaks than commonly occur in an ordinary workplace" due to his "pain and physical limitations[.]" (Doc. 8-1 at 93, 107). Although Dr. Voss and Dr. DiFonso are psychologists, and this portion of their opinions addresses Plaintiff's need for rest breaks due to his physical limitations, the connection between Plaintiff's physical condition and pain and his mental health symptoms is not outside the ambit of their expertise. *Cf. Wilson v. Colvin*, 213 F. Supp. 3d 478, 487 (W.D.N.Y. 2016) (citing as corroboration for plaintiff's diagnosis of chronic pain syndrome his behavioral psychologist's assessment of how plaintiff's pain and depression were related). Dr. Froman explained the mental-physical connection at some length. The ALJ did not acknowledge that explanation, much less accept or reject it.

The VE testified that in competitive employment, the tolerance for unexcused or unscheduled absences would be "one or two" a month "but . . . not every month" and the tolerance for off-task time would be "no more than 10[ percent] of a day[.]" (Doc. 8-1 at 65.) Plaintiff's need for "more rest breaks than commonly occur in an ordinary workplace" would affect his absenteeism and off-task time, but the ALJ did not account for this limitation in the RFC or further develop the record regarding whether Plaintiff's mental health symptoms would cause him to miss work. *Id.* at 93, 107.

"Because a determination of whether and how often Plaintiff would be off-task and absent is critical to the disability determination, a remand is required for further development of the record." *Michelle M. v. Comm'r of Soc. Sec.*, 2023 WL 2986850, at *9 (D. Vt. Apr. 18, 2023); *see also Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (reversing and remanding for further fact-finding because "[t]he record [was] unclear as to the length of individual breaks [the plaintiff] would need, and it [was] unclear as to the

23

availability of jobs that could accommodate whatever breaks he needed").

## CONCLUSION

For the reasons stated above, the court GRANTS Plaintiff's motion for an order reversing the decision of the Commissioner (Doc. 9) and DENIES the Commissioner's motion to affirm (Doc. 10).

SO ORDERED.

Dated at Burlington, in the District of Vermont, this 27th day of February, 2025.

Christina Reiss, Chief Judge
United States District Court